781 So.2d 436 (2001)
Helen K. MONAHAN, Appellant,
v.
Elizabeth L. DAVIS, Mary Jo Miles, Patricia Taylor, Teresa McCullough, Betty Kish, individually and as Trustee of the Betty Kish Revocable Trust, B & L Services, Inc., a Florida corporation, and Gregory Evans, Appellees.
No. 4D00-1982.
District Court of Appeal of Florida, Fourth District.
February 28, 2001.
Rehearing Denied April 20, 2001.
*437 Amy D. Shield of Amy D. Shield, P.A., Boca Raton, and Law Office of Barry A. Eisenson, Coconut Creek, for appellant.
Gregg W. McClosky, and David J. Pascuzzi of Mattlin & McClosky, Boca Raton, for Appellee-Elizabeth L. Davis.
GROSS, J.
Helen Monahan appeals the trial court's order granting a partial final summary judgment, dismissing with prejudice her case against appellee, Elizabeth Davis, and barring recovery against appellee, Betty Kish, for any wrongdoing that occurred prior to 1994. The court based its ruling on the statute of limitations. We reverse, because genuine issues of material fact remain as to whether the "delayed discovery" doctrine applies to bring Monahan's causes of action within the statute of limitations.
The salient facts may be briefly stated. Helen Monahan is an elderly woman who suffers from senile dementia. Her niece, Barbara Sadler, was appointed her guardian in February, 1999. Beginning in 1997, Monahan filed suits against various family members concerning their misappropriation of her financial assets. In April, 1998, the court entered a final judgment against three nieces to quiet title to a condominium.
Monahan's fifth amended complaint contained six counts seeking damages from her sister Betty Kish and her niece Elizabeth Davis. The counts included breach of fiduciary duty, civil theft, conspiracy, conversion, and unjust enrichment, arising from the wrongful taking of cash, stocks, bonds, interest, dividends, and pension and social security payments. After her husband died, Monahan placed her financial affairs in the hands of Kish and Davis. The complaint estimated that Kish and Davis wrongfully appropriated $587,267 of Monahan's assets. A paragraph of the complaint asserted that the statute of limitations did not bar the action because Monahan did not find out about the misappropriations until October, 1995, when she first discovered that Davis had wrongfully attempted to transfer partial title to the Florida condominium.

I
Appellees argue that the delayed discovery doctrine does not apply to the causes of action here at issue. They cite Halkey-Roberts Corp. v. Mackal, 641 So.2d 445, 447 (Fla. 2d DCA 1994), to support their contention that the doctrine is limited by section 95.031(2), Florida Statutes (2000), to causes of action for products liability and fraud. This narrow view of the delayed discovery doctrine is at odds with the supreme court's application of it in Hearndon v. Graham, 767 So.2d 1179 (Fla.2000).
In Hearndon, the supreme court applied the doctrine to intentional torts arising from childhood sexual abuse of the plaintiff. Id. at 1182. The statute of limitations for such intentional torts was found at section 95.11(3)(o).[1] Such causes of action were different from fraud or products *438 liability, indicating that, contrary to appellees' argument, the doctrine applies to delay the accrual of causes of action other than those mentioned in section 95.031(2). The language in Halkey-Roberts, which is supported by no analysis, is in conflict with the later supreme court decision in Hearndon.
The supreme court's discussion of the delayed discovery doctrine demonstrates that it is rooted in the common law, not created by statute. The court described the doctrine as generally providing "that a cause of action does not accrue until the plaintiff either knows or reasonably should know of the tortious act giving rise to the cause of action." Hearndon, 767 So.2d at 1184.
The supreme court adopted the "blameless ignorance" doctrine of Urie v. Thompson, 337 U.S. 163, 170, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) into Florida law in City of Miami v. Brooks, 70 So.2d 306, 309 (Fla.1954). See Hearndon, 767 So.2d at 1184. In Creviston v. General Motors Corp., 225 So.2d 331, 334 (Fla.1969), the court explained that the holdings of Urie and Brooks
appear to crystallize in favor of application of the blameless ignorance doctrine in those instances where the injured plaintiff was unaware or had no reason to know that an invasion of his legal rights has occurred. In reality, such a doctrine is merely a recognition of the fundamental principle that regardless of the underlying nature of a cause of action, the accrual of the same must coincide with the aggrieved party's discovery or duty to discover the act constituting an invasion of his legal rights.

(Italics supplied).
Hearndon held that the delayed discovery doctrine, when properly applied, operates to delay the accrual of a cause of action. 767 So.2d at 1184. "[A]ccrual pertains to the existence of a cause of action which then triggers the running of a statute of limitations[.]" Id. at 1185. The court observed that in section 95.051, Florida Statutes (1987), the legislature limited the circumstances when a cause of action might be tolled, or interrupted, after accrual. Hearndon, 767 So.2d at 1185. The court stated that the legislature "did not likewise limit the circumstances under which accrual may have been delayed." Id. (footnote omitted). Hearndon receded from past decisions that applied the delayed discovery doctrine to toll the running of the statute of limitations; the case reaffirmed that the doctrine still applied to delay the accrual of causes of action.
Under Hearndon, the proper reading of section 95.031(2) is that it limits the application of the delayed discovery doctrine in cases of fraud and products liability "under s. 95.11(3)." Nothing limits the application of the doctrine to the causes of action at issue in this case.

II
In reviewing this case, every possible inference must be viewed in Monahan's favor, and if the slightest doubt exists as to the presence of an issue of fact, then summary judgment was inappropriate. See Albelo v. So. Bell, 682 So.2d 1126, 1129 (Fla. 4th DCA 1996). As we recently wrote:
If the record reflects the existence of genuine issues of fact or the possibility of any issue, or if the record raises even the slightest doubt that an issue might exist, that doubt must be resolved against the party moving for summary judgment.
Quest Air So., Inc. v. Memphis Group, Inc., 733 So.2d 1109, 1110 (Fla. 4th DCA 1999) (citation omitted).
*439 In the light most favorable to Monahan, Davis deposited $202,687 of Monahan's money coming from bank accounts, certificates of deposit, and savings bonds into her own account at Sovereign Bank in Maryland. Davis's mother, Kish, opened a joint account with Monahan at Barnett Bank, deposited over $232,560 of Monahan's money, and maintained all control over it. Neither woman has provided an accounting to explain what happened to Monahan's money.
In their depositions, both Davis and Kish stated that Monahan knew about their transfers and expenditures of funds and consented to them. Monahan is now incompetent, suffering from dementia and loss of memory,[2] so her ability to refute the appellees' claims is limited. Since she was not present during any of the transfers of funds, Monahan's guardian, Barbara Sadler, cannot testify from her personal knowledge as to the circumstances surrounding the transfers.
Nonetheless, Sadler was able to testify to facts that give rise to the inference that Monahan was unaware of the wrongful appropriation of her money; Monahan can then argue under the delayed discovery doctrine that she neither knew, nor reasonably should have known, of the wrongful acts giving rise to the causes of action stated in the fifth amended complaint. Many of Monahan's statements to Sadler are admissible through Sadler as non-hearsay to show Monahan's state of mind inconsistent with notice or knowledge, see CHARLES W. EHRHARDT, FLORIDA EVIDENCE § 801.6, 632-33 (1999 ed.), or as an exception to the hearsay rule under section 90.803(3), Florida Statutes (2000).
Sadler testified that Monahan complained that Kish and Davis did not give her enough money on a monthly basis to meet her needs. Monahan said that she had to clean Kish's house in order to earn spending money. Kish provided Monahan only $300 a month, and yet in June, 1995, Kish's attorney wrote that Monahan had only $41,000 in assets left. Monahan did not understand why she did not have enough money, since she was always able to meet her bills when she lived in New York. Monahan did not drive, could not see the documents she was asked to sign, and often had to turn her hearing aid off because of incessant whistling.
It was not until after she left appellees' control in Florida and moved to stay with her brother in Cincinnati that Monahan had successful cataract and glaucoma surgery and purchased state of the art hearing aids. After this medical treatment, Monahan became more active, communicated better with others, and was independent in her daily life.
Viewed in the light most favorable to Monahan, the conduct and statements of *440 Kish and Davis raise serious questions about the propriety of their behavior. Davis had her housekeeper, Lois Majette, introduce her as Monahan to the employees at Citizen's Bank. While impersonating Monahan, Davis cashed in $74,000 worth of savings bonds that she later placed into her own personal account. Davis also forged Monahan's name on checks received when the savings bonds were cashed in order to deposit the checks in her own account. Furthermore, Davis represented that an account had been opened at Citizen's Bank in Monahan's name. Citizen's Bank has been unable to locate any account ever opened in Monahan's name.
Davis claimed that she spent $65,000 on Monahan's Florida apartment. Kish's attorney contended that Monahan owed Kish money for expenses pertaining to the remodeling of Monahan's apartment. However, only $25,000 in expenditures have ever been verified. The condominium's contents were insured for only $25,000.
Davis claimed that she spent part of the money from Monahan's closed accounts to pay fees and monthly bills incurred while Monahan was still living alone in New York. However, those expenses, totalling $14,000, were paid from Monahan's Chase Manhattan Bank account prior to its liquidation.
Kish stated that she owned the Kish/Monahan joint account at Barnett Bank and that she made deposits into the account to cover Monahan's expenses. However, the joint account was almost exclusively funded by proceeds from Monahan's liquidated assets. Kish also stated that she repaid herself from the account for loans made to Monahan; after a review of Monahan's records, Sadler[3] could identify no money that Monahan ever received as a loan from Kish.
This case raises issues of fact as to whether the delayed discovery doctrine applies to make Monahan's claims timely under the statute of limitations. Since they involve the same legal issue, we reverse both orders on appeal, signed May 30 and April 18, 2000.
REVERSED AND REMANDED.
STEVENSON and HAZOURI, JJ., concur.
NOTES
[1] The complaint in Hearndon v. Graham, 767 So.2d 1179 (Fla.2000), was filed in 1991. In Chapter 92-102, Laws of Florida, sections 1 & 2, the legislature created section 95.11(7), which applies to actions "founded on alleged abuse, as defined in s. 39.01, s. 415.102, or s. 984.03, or incest, as defined in s. 826.04." That section did not apply to the cause of action in Hearndon. 767 So.2d at 1186.
[2] Monahan's mental state is best demonstrated by her conduct at her deposition in Florida. She became disoriented. She confused her nephew, Bill Sadler, with her attorney. She had trouble remembering her sister, appellee Betty Kish. Despite her confusion, appellees' lawyer asked Monahan if she would settle the case for $5,000. She responded:

I'll say yes because we are a family and if it means that much to not return money to me, keep it. I'll get another job or some darn thing and I'll manage to live somehow till the twentieth century. I have a yen to live till the twentieth century so that I can see all the things that is going to happen. Mercury, Venus, Mars, Jupiter, Saturn, Uranus and Neptune, if those people who live on all those planets, are like us? Are they people, you know, like we are humans or are they different? They can be different and it will be nice to see that before you die.
It was after Monahan returned from her deposition to Cincinnati, that her doctor confirmed that she was suffering from dementia.
[3] Barbara Sadler is a certified public accountant with forty years of experience in the accounting profession. For many years, she worked as a CPA in the regional office of the Internal Revenue Service.